**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| M.B., et al.,<br><br>     Plaintiffs,<br><br>     *v.*<br><br>**CHESTER COUNTY INTERMEDIATE UNIT,**<br><br>     Defendant. | CIVIL ACTION<br><br><br>NO. 19-2622-KSM |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                            **February 22, 2022**

During the 2014–2015, 2015–2016, and 2016–2017 school years, M.B., a minor child, attended Villa Maria Academy, a private school within the boundaries of the Chester County Intermediate Unit ("CCIU"). While at Villa Maria, M.B. received Act 89 services[1] from a CCIU reading specialist once a week, and M.B.'s parents, K.B. and D.B., allege that they were never informed that the CCIU reading specialist believed that M.B. had a learning difference. Accordingly, M.B.'s parents filed a due process complaint, alleging that the CCIU failed to satisfy its child find obligations for parentally placed private school students with respect to M.B. under the Individuals with Disabilities Education Act ("IDEA"), 42 U.S.C. § 1400, and

---

[1] Pursuant to Act 89, the CCIU provides services to private schools in its region, including reading specialists, math specialists, speech and language therapists, and school or guidance counselors. (Hr'g Tr. at 176:15–21; *see also id.* at 248:15–23 (explaining that "Act 89 is an amount of funds that [the CCIU] get[s] to provide remedial services within the non-public schools" and the types of services it provides).) *See also* 24 Pa. Stat. & Cons. Stat. § 9-922.1-A (stating that "[s]tudents attending nonpublic schools shall be furnished a program of auxiliary services" that will be "provided by the intermediate unit in which the nonpublic school is located" and defining auxiliary services as including, *inter alia*, "remedial services" and "guidance, counseling and testing services").

Pennsylvania law, and seeking tuition reimbursement and compensatory education.

After conducting a special education due process hearing, an administrative hearing officer determined that M.B.'s parents, K.B. and D.B., failed to timely file their due process complaint against the CCIU.  (*See* HO Decision at pp. 20–24.)  The hearing officer alternatively concluded that the CCIU had satisfied its child find obligations.  (*See id.* at pp. 24–30.)  The hearing officer also denied Plaintiffs' demands for compensatory education and tuition reimbursement.  (*Id.* at 21–33.)

As permitted under the IDEA, Plaintiffs filed a complaint in this Court challenging the hearing officer's determinations that the due process complaint was time-barred, that the CCIU fulfilled its child find obligations, and that compensatory education and tuition reimbursement were not appropriate.  (Doc. No. 1.)  Plaintiffs allege that the CCIU violated the IDEA, Section 504 of the Rehabilitation Act of 1973, the Americans with Disability Act ("ADA"), and Chapters 14 and 15 of the Pennsylvania Code.  (*Id.*)  Subsequently, Plaintiffs filed a Motion for Judgment on the Administrative Record, which is presently before the Court (Doc. No. 10).  Following oral argument and for the reasons discussed below, Plaintiffs' motion is denied.

## I.

### A.    *Factual Background*

M.B. is presently a thirteen-year-old who resides with her parents in Chester County, Pennsylvania, which is within the boundaries of the CCIU.  (*See* HO Decision at p. 3 ¶ 1.)

### 1.  Early Education and First Grade at Villa Maria (2014–2015)

M.B. started preschool at Westminster, a religious school in West Chester.  (Jan. 28, 2019 Tr. ("Hr'g Tr.") at 322:1–21.)  After M.B.'s parents determined that Westminster was not a "good fit for her educationally," she moved to Springton Lake Montessori School in Edgemont

and attended preschool there "until she was ready for kindergarten." (*Id.*)  Then, during the

2013–2014 school year, M.B. attended half-day kindergarten at Westtown-Thornbury, a public

elementary school in the West Chester Area School District ("WCASD").  (*See id.*; HO Decision

at p. 3 ¶ 2).)  According to M.B.'s parents, "Kindergarten was a bit of a bumpy road" for her; she

got distracted easily and experienced difficulties with reading.  (Hr'g Tr. at 323:2–15; *see also* P-

9 at p. 2 (WCASD report stating that "[M.B.'s] Kindergarten teacher noted some concerns about

[M.B.'s] reading and phonics acquisition.  [M.B.'s parents] noticed at that time it was hard for

[M.B.] to follow through on instructions because she would get distracted."); P-7 at p. 3 (Dr.

Rosoff's report stating that during kindergarten, M.B.'s readiness development seemed "weak in

the areas of reading, writing and attention" and that she "struggled in learning the letters of the

alphabet and identifying sound/symbol relationships").)

In an attempt to place her in an environment more tailored to her educational needs,

M.B.'s parents enrolled her at Villa Maria Academy, a private, all-girls school, for first grade,[2]

the 2014–2015 school year.  (Hr'g Tr. at 323:2–15; *see also* P-7 at p. 3 (Dr. Rosoff's report

stating that M.B.'s parents felt that M.B.'s learning was "particularly impeded by a

[Kindergarten] classroom populated by a group of rambunctious boys" and that she would

benefit from "a single-sex school"); P-9 at p. 2 (WCASD report stating that "[M.B.'s] Parents

hoped that a single sex education might decrease the distractions that occurred for [M.B.] in

kindergarten.").)

At the beginning of the school year, M.B.'s first grade teacher, Mrs. Long, referred M.B.

to Eileen Delaney, a resource coordinator at Villa Maria.  (Hr'g Tr. at 323:25–325:4.)  Mrs. Long

---

[2] "There was conversation" about M.B. possibly repeating kindergarten; however, because of M.B.'s "tall
stature, her parents decided to advance her to first grade."  (P-7 at p. 3.)

told M.B.'s parents that M.B.'s "reading isn't progressing to the point where I would expect it to" and thought that the fact that M.B. attended half-day kindergarten, as opposed to full-day kindergarten, might have "impacted [M.B.'s] reading progression." (*Id.*) Mrs. Delaney taught the Wilson Reading System to M.B. two times per week during first grade. (*Id.*; P-1.)

Shortly thereafter, Mrs. Long referred M.B. to the CCIU for Act 89 reading support services. (*See* S-1; HO Decision at p. 4 ¶ 6; *see also* Hr'g Tr. at 324:23–325:4.) In October 2014, M.B. began working with Glendia Kennedy, a CCIU reading specialist,[3] once a week for about twenty-five minutes. (S-1; Hr'g Tr. at 115:18–20, 148:5–14; P-1 at p. 6.) Ms. Kennedy met with M.B., along with two other first graders, for group instruction. (Hr'g Tr. at 148:22–149:3, 150:3–7; S-2.)

In January 2015, Ms. Kennedy completed a progress report for M.B.'s parents. (S-2.) The report states that M.B. "comes to class prepared to work" but is "easily distracted" and "lacks confidence as a reader." (*Id.*)

On May 11, 2015, towards the end of M.B.'s first grade year, the Villa Maria staff, including Mrs. Long, Mrs. Delaney, Sister Nancy (the then-vice principal of Villa Maria Lower School), and M.B.'s parents met to discuss the process for providing M.B. with an Instructional Support Team ("IST") in second grade. (*See* P-1 at p. 1; *see also* Hr'g Tr. at 327:23–24.) Specifically, M.B. would continue to receive instruction from Mrs. Delaney in the Wilson Reading System twice a week, as well as the Act 89 services from Ms. Kennedy once a week. (*See* P-1 at p. 1.) During this meeting, the teachers discussed the progress M.B. had made in reading during first grade, and it was agreed that M.B.'s parents would send M.B. to the

---

[3] Ms. Kennedy provided Act 89 services for three different private schools—Villa Maria, Montgomery School, and Kimberton Waldorf School. Ms. Kennedy split her time between these three schools and worked with Villa Maria students on Tuesdays and Thursdays. (Hr'g Tr. at 102:14–20, 145:22–146:11.)

Benchmark School's intensive summer reading program so that she would continue reading over the summer. (*Id.*; Hr'g Tr. at 368:23–25, 370:11–12.).[4]

Following this meeting discussing the IST process, M.B.'s parents also had a telephone conference with Ms. Kennedy on May 29, 2015. (P-1 at p. 7.) From what appears to be Ms. Kennedy's handwritten notes, Ms. Kennedy and M.B.'s parents discussed the IST process that would be in place for M.B. in second grade and the summer program at the Benchmark School. Also, Ms. Kennedy noted that she would send home M.B.'s progress report and diagnostic testing results.[5] Ms. Kennedy testified that while working with M.B. during first grade, she believed that M.B. "had a learning difference"[6] and recalled that she recommended to M.B.'s teacher and principal at Villa that M.B. receive psychoeducational testing. (Hr'g Tr. at 123:12–124:10.) When asked whether this testing occurred, Ms. Kennedy testified that she recalled having a conversation with M.B.'s parents at the end of first grade (May 2015) and that they planned to have M.B. tested by M.B.'s mother's friend, a reading specialist in New York. (*Id.*) Ms. Kennedy noted that she never saw the results of any testing. (*Id.*) Notably, M.B.'s mother disagrees with Ms. Kennedy as to this timing of the conversation regarding her reading specialist

---

[4] Benchmark School is known as a school for children with disabilities. (*See, e.g.*, Hr'g Tr. at 47:13–15 ("Q: Do you know what population of students the Benchmark School serves? A [Dr. Kristy Kane, school psychologist]: They serve students with disabilities.").) However, according to M.B.'s mother, there is a distinction between attending Benchmark School during the school year versus attending the reading camp there during the summer. (*See* Hr'g Tr. at 377:13–22 ("Because in my mind, Benchmark camp isn't Benchmark School. Benchmark camp is open to anybody . . . [I]f you want to go there, they're happy to accept you . . . I don't believe, although I've never asked anyone, if [sic] the school operates the same way.").)

[5] The testing was a Stanford Diagnostic Reading Test that M.B. completed in Spring 2015. (P-1 at p. 8.) The report indicated that M.B. had made positive progress in phonetic analysis, vocabulary, and comprehension. (*See id.*)

[6] Ms. Kennedy testified that she suspected that M.B. might have needs related to reading and attention or executive functioning in first grade, but she did not at that point think M.B. had needs related to social skills functioning. (*See* Hr'g Tr. at 120:8–21.)

friend.  M.B.'s mother testified that she did not recall speaking to Ms. Kennedy about having M.B. tested by her reading specialist friend until February 2017, when M.B. was in third grade at Villa Maria.  (*See id.* at 326:25–327:13, 330:1–6.)

The next month, in June 2015, Ms. Kennedy completed an end of year progress report, which stated that M.B. "demonstrate[d] knowledge of grade level vocabulary" and that her word identification had "much improved."  (P-1 at p. 6.)  However, with respect to reading comprehension, Ms. Kennedy noted that M.B. has "difficulty in making inferences and drawing conclusions" and "needs concrete examples to make connections."  (*Id.*)  Overall, Ms. Kennedy found that M.B. had "shown growth as a reader" and "gained confidence" but recommended that M.B. "continue in the CCIU Reading Program [in the second grade] to strengthen decoding and comprehension skills."  (*Id.* at p. 7.)

### 2.   Summer Program at Benchmark School (Summer 2015)

During the summer of 2015, between first and second grade, M.B. attended an intensive summer reading program at the Benchmark School, which lasted about six weeks.  (Hr'g Tr. at 367:24–25.)  During the program, M.B. was expected to read in the evening for about thirty minutes.[7]  (*Id.* at 369:15–370:6.)

### 3.   Second Grade at Villa Maria (2015–2016)

In the fall 2015, M.B. began second grade in Mrs. Grieves's classroom with the additional support put in place with the IST.[8]  (*See* P-1 at p. 2.)  M.B. continued to receive extra

---

[7] The parties have not provided any progress reports from the summer program.  In addition, M.B.'s mother did not recall how M.B. scored on the reading assessment M.B. took before being placed into the summer program; whether she received daily or weekly communication from the reading teacher working with M.B.; how long M.B. was supposed to read at night during the program; when the parent-teacher conference occurred during the summer or what the teacher told her during the conference; or who M.B.'s teacher was.  (*Id.* at 367:2–10, 368:12–17, 369:20–370:6, 370:16–25, 371:13–20.)

[8] According to M.B.'s mother, Mrs. Grieves "was not the most accommodating.  (Hr'g Tr. at 327:9–11.)

support in reading—in particular, M.B. attended weekly 25-minute sessions with Ms. Kennedy with one other second grader, and she also received twice weekly reading instruction in the Wilson Reading System with Mrs. Delaney.  (*See, e.g.*, S-5; P-1 at pp. 2–3.)

The IST team, which included Mrs. Grieves, Mrs. Delaney, Sister Nancy, and M.B.'s parents, met in October 2015.[9]  (P-1 at p. 2.)  The IST team noted that M.B. had "grown as a reader," "reads fluently with good inflection," and "knows the meaning of words that are introduced," though "she sometimes guesses at the words or asks what the word is."  (*Id.*)  The team also discussed how M.B. "sometimes is distracted in the classroom" but noted that she "is easily redirected."  (*Id.*)

On February 4, the IST team held M.B.'s mid-year conference via telephone.  (*Id.* at p. 3.)  The team noted that M.B. "is able to read class materials and is beginning to use decoding words in the classroom," and that her oral reading fluency score had improved.  (*Id.* ("On a recent oral reading fluency screening [M.B.] was able to read 56 words correct per minute (wcpm).  This has increased from her September score which was 28 wcpm.  Her accuracy has also increased from 85% to 94%.").)  The team also provided Ms. Kennedy's progress report which noted that M.B. "enjoys reading whatever is presented to" her but "does not always speak up and ask questions when she does not understand."  (S-5.)  Ms. Kennedy also indicated that they were "working on syllable types and patterns to enhance reading and spelling."  (*Id.*)  Last,

---

M.B.'s mother testified that "second grade was an incredibly difficult year" for M.B.  (*Id.* at 327:23–328:18.)  M.B. "spent most nights crying over her homework, crying that she had no friends, crying that the people were mean to her, crying that she couldn't read, that she was stupid."  (*Id.*)

[9] Ms. Kennedy does not recall whether she attended any of M.B.'s IST conferences; she would have only attended if the conferences were scheduled on a Tuesday or a Thursday when she was at Villa Maria.  (*See* Hr'g Tr. at 152:15–153:5.)  None of the IST logs list Ms. Kennedy as a participant.  (*See generally* P-1.)

the team discussed implementing a "behavior modification plan" to increase M.B.'s attention, as she had been distracted in the classroom. (*Id.*)

At the end of the year, in May 2016, Ms. Kennedy completed another progress report, which indicated that M.B. started the year in the 65th percentile for reading comprehension and ended the year in the 61st percentile. (S-7.) M.B. was "able to scan text for answers to questions" but was still experiencing "difficulty with inferences" and "critical thinking skills." (*Id.*) The report also indicated that M.B. was "making progress" with decoding. (*Id.*) Ms. Kennedy recommended that M.B.'s parents continue to read and discuss books with her over the summer and to place emphasis on "inferences and critical thinking skills along with vocabulary as she reads." (*Id.*) Ms. Kennedy also suggested that M.B. practice her reading and writing skills by using "Reading Skills" workbooks over the summer and to try the Chester County Library's summer reading program. (*Id.*) Finally, Ms. Kennedy recommended that M.B. continue in the CCIU reading program in the third grade but noted that she could be reevaluated in December to determine "if she should continue or be dismissed at that time." (*Id.*) Ms. Kennedy also stated that "Benchmark" was "a good fit" for M.B. "to keep the momentum of reading" over the summer. (*Id.*).

### 4. Summer Program at Benchmark School (Summer 2016)

During the summer of 2016, between second and third grades, M.B. attended the Benchmark summer reading camp program again. [10] (Hr'g Tr. at 328:19–25.)

---

[10] M.B.'s mother did not recall whether M.B. had to take another assessment before starting the summer program; she did not recall when the parent-teacher conference took place or what was discussed during the meeting. (*See* Hr'g Tr. at 374:13–20, 375:3–12.) M.B.'s mother only recalled that "no one [at Benchmark] ever said the words 'Dyslexia' or 'ADHD.'" (*Id.*)

### 5.  Third Grade at Villa Maria (2016–2017)

#### a.      The Beginning of the Year

In third grade, M.B. continued to receive twice weekly reading instruction in the Wilson Reading System from Mrs. Delaney.  (P-7 at pp. 4–5.)  M.B. also continued to meet with Ms. Kennedy for CCIU reading support once a week.[11]  (*See, e.g.*, P-1 at p. 4; S-8; S-12; P-7 at p. 4.)  Ms. Kennedy also coordinated with M.B.'s third grade teacher, Ms. Campbell, giving her behavioral strategies to implement in the classroom that would help M.B.  (Hr'g Tr. at 159:2–16.)

M.B.'s mother testified that at the beginning of M.B.'s third grade year, she went to the school to talk to Ms. Campbell "right away."  (*Id.* at 329:3–15).  According to M.B.'s mother, Ms. Campbell "had started the year off almost punishing the girls if they didn't behave properly – you would get a note in the book, you know, she was doodling today, she wasn't paying attention."[12]  (*Id.*)  M.B.'s mother requested that M.B. be seated towards the front of the classroom and explained that M.B. "is not a student that can be rewarded with negative reinforcement."  (*Id.* at 329:3–25.)  In October 2016, the IST team—which included Ms. Campbell, Mrs. Delaney, M.B.'s parents, and Sister Patricia (the vice principal of Villa Maria Lower School)—met.  (P-1 at p. 4.)  "All team members state[d] that while [M.B.] has made solid strides in the area of reading her areas of need remain with attention to task and

---

[11] M.B.'s mother testified that at the beginning of third grade, the "CCIU had said [M.B] no longer needed their services" and she "was not enrolled" in their services.  After the Benchmark summer program, M.B.'s parents requested "that she be put back into the CCIU for the services, and she was." (Hr'g Tr. at 331:16–22.)  The Court notes, however, that Ms. Kennedy's June 2015 progress report from the end of second grade year recommended that M.B. continue with the CCIU reading program in third grade for extra support.  (*See* S-7 at p. 3.)  And Ms. Kennedy testified that when she started working with M.B. in third grade, she did not recommend that M.B. be exited from the program.  (Hr'g Tr. at 157:22–25.)

[12] Ms. Campbell sent home daily reports about how M.B. was "doodling" or "wasn't paying attention" and M.B. would cry during class.  (*Id.* at 329:3–25; *see also* P-7 at p. 5).)

organizational skills both at home and school." (*Id.*) The team found that M.B.'s "need to be more comfortable in social situations in school" was "a significant area of concern." (*Id.*) "To increase [M.B's] confidence in peer relationships" the team decided that M.B. should receive support from the school counselor and that Mrs. Delaney would also work with M.B. on "strategies for peer interaction." (*Id.*) The team also discussed limiting the time frame in which M.B. should work on homework to "avoid[] fatigue." (*Id.*; *see also* Hr'g Tr. at 332:10–17.)

### b.  *Mid-Year Private Evaluation by Dr. Young*

M.B.'s mother testified that in January 2017, M.B. "completely bombed" a timed test on her math facts, despite having clearly known the math facts while practicing with her mother at home beforehand. (Hr'g Tr. at 332:18–333:11.) This prompted M.B.'s mother to email Ms. Campbell, saying, "I hear about kids getting accommodations for more time on tests. How can I get that for M.B.?" (*Id.*) Ms. Campbell responded that M.B. could only receive testing accommodations, such as more time on tests, after receiving psychoeducational testing. (*Id.*; *see also id.* at 336:15–20.)

M.B.'s mother then reached out to a friend whose child also had difficulty with following multistep verbal directions and had met with Dr. Maxine Young for auditory testing. (*Id.* at 335:3–12.) M.B.'s parents arranged for M.B. to be tested by Dr. Young. (*Id.*) The testing was done in January and February 2017. (*See* S-14.) Dr. Young diagnosed M.B. with Auditory Processing Disorder ("APD") and determined that M.B.'s reading comprehension problems and attention issues in the classroom were in part due to her APD. (*Id.* at p. 7.) Dr. Young also found that M.B. had difficulties with language processing and a word finding deficit, which impacts reading comprehension as well. (*Id.* ("Having both word finding deficit and Auditory Processing Disorder can really contribute to learning difficulties since much teaching is aural.").)

10

Dr. Young made a number of recommendations, including having M.B. do auditory trainings and language therapy, giving M.B. accommodations while taking tests that involve reading and writing, and having a comprehensive reading evaluation performed on M.B., among other things. (*Id.* at pp. 8–11.)

        ***c.***        ***Mid-Year Progress:  Discussions with the IST Team and Ms. Kennedy***

At the end of January 2017, while the results of M.B.'s testing with Dr. Young were still pending, the IST team reconvened to discuss M.B.'s progress.  (P-1 at p. 5.)  "Mrs. Delaney reported that [M.B.] ha[d] shown progress in assessments suggesting that homework strategies are working."  (*Id.*)  The team noted that although M.B.'s "math facts are good and she generally has rapid recall," her reading assessments "are inconsistent in success."  (*Id.*)  The team discussed M.B.'s sensitivity to "others' comments" and her tendency "to misinterpret."  (*Id.*; *see also* P-7 at p. 4 ("Socially, [M.B.] has difficulty making friends and interacting with her peer group.  She tends to think the worst, believing that her peers dislike her.").)  As such, one of the team's main goals, aside from increasing M.B.'s decoding skills and reading fluency, was "to continue to support [M.B.'s] confidence in peer relationships through in-counselor assistance . . . and to offer affirmation both at home and school for social and learning achievements."  (P-1 at p. 5.)  M.B.'s parents also indicated that she was working with a private tutor twice a week: during each session, the tutor spent half an hour on homework and half an hour on reading.[13] (*Id.*)  The team discussed what type of programming M.B. should do for the summer—i.e., whether she should continue with her private tutor or whether she should again enroll in the

---

[13] According to the IST log, M.B.'s mother reported that M.B. was working with her tutor once a week, but that is inconsistent with M.B.'s mother's February 7, 2017 email to Ms. Kennedy, which states that M.B. met with the tutor two times a week (*see* P-4 at p. 3), and the mother's testimony at the due process hearing, which states that M.B. saw a tutor one to two times a week (*see* Hr'g Tr. at 340:20–341:4).

Benchmark summer program.  (Hr'g Tr. at 339:24–12.)

That same day, Ms. Kennedy compiled a mid-year report on M.B.'s progress.  (S-12.)
The report showed M.B. had a mid-year raw score of 6/9 on the Fountas and Pinnell ("F&P")
assessment for reading comprehension and tested at 95% for decoding, meaning that M.B.'s
reading comprehension and decoding levels were that of a child in the middle of second grade,
despite the fact that she was in the middle of third grade.[14]  (*Id.*; *see also* P-4 (stating that M.B.
"tested at Level L which is the middle of second grade")).)  The report indicated that M.B.
continued to have "difficulty with critical thinking skills."  (S-12.)  In her comments, Ms.
Kennedy noted that M.B. "is a serious student, but she has difficulty focusing on what she is
reading.  As a result, her fluency and attention to details in a text are affected."  (*Id.*)

Following the IST meeting and after receiving M.B.'s scores from Ms. Kennedy, M.B.'s
mother reached out directly to Ms. Kennedy to discuss M.B.'s summer plans for reading.  (P-4.)
M.B.'s mother stated that the IST team "seemed to think that [M.B.] didn't necessarily need to
go [to the Benchmark summer reading camp] again."  (*Id.*)  M.B.'s mother noted that the
Benchmark summer program "is quite a commitment"[15] and asked Ms. Kennedy for her opinion
on whether "it would be wise for [M.B.] to go again" or whether it "would be sufficient if [they]
kept up with tutoring over the summer" instead.  (*Id.*)  M.B.'s mother also stated that she had
received the mid-year report from Ms. Kennedy and "was a bit surprised that [M.B.] testing at
middle of second grade for her reading skills," which made her mother question if "perhaps

---

[14] This was the first time that Ms. Kennedy used the F&P with M.B.  (Hr'g Tr. at 110:3–16 (Ms.
Kennedy's testimony that they began using the F&P in the fall of 2016); *see also id.* at 285:6–11 (Dr.
Weaver's testimony that the F&P was adopted in "2015, '16" after the Stanford Diagnostic Reading Test
was retired).)

[15] When asked "why" she said the program was "quite a commitment," given that it only lasted six weeks,
M.B.'s mother explained that it was "financially" a large commitment.  (Hr'g Tr. at 369:7–14.)

another summer at Benchmark might be the best thing for her." (*Id.*)  Ms. Kennedy responded

that if M.B. had "a good relationship with the tutor," then she "think[s] that a tutor is the

answer," and noted that it would be "a good way for [M.B.] to get individual attention," which is

"good when a child has difficulty focusing." (*Id.*)[16]

About a week later, Mrs. Delaney reached out to M.B.'s mother after having

administered an Individual Reading Inventory ("IRI") to M.B.  (S-13.)  Mrs. Delaney reported

that M.B. "scored at the end of third grade" on the auditory analysis skills test, but that M.B.

"demonstrate[d] a relative weakness in decoding skills" on the core phonics survey.  (*Id.*)  M.B.

was "able to recognize sight words at the 3rd grade level" and read with 95% accuracy when

reading out loud.  (*Id.*)  Overall, Mrs. Delaney reported that "the results of th[e] assessment

indicate[d] that [M.B.] was reading at the 3rd grade level." (*Id.*)  Mrs. Delaney then explained the

differences between the IRI that she administered and the F&P assessment that Ms. Kennedy had

administered, and how that could have accounted for the different results.[17]  Mrs. Delaney stated

that M.B. would "benefit from support with decoding skills, fluency, and recognizing details"

and that she would discuss the results with the IST team and they would adjust M.B.'s support

plan accordingly.  (*Id.*)

---

[16] Ms. Kennedy testified that she agreed that it would be good for M.B. to work with a tutor because she did not want to go against Villa Maria's recommendation.  (*See* Hr'g Tr. at 143:23–144:10 ("Q: Why did you recommend [M.B.] work with a tutor rather than Benchmark?  A: Because when they had an IST meeting, Villa – the Villa teachers, Villa principal, and Ms. Delaney who was like her support person, didn't think it was necessary for her to go to Benchmark again.  And so because I was trying to be supportive of what they decided and I didn't really want to go against what they said.").)

[17] (*See id.* ("Mrs. Kennedy noted that [M.B.] could summarize but not retell with detail.  The retell is a major part of the F & P comprehension score.  [M.B.] did miss questions that related to details in the IRI but that only resulted in 2 ½ questions that were missed.  [M.B.] may need support with recognizing details and that would show more in the results of the F & P than in the IRI.  Also Mrs. Kennedy reported that attention influences affect fluency.  Focus could be an issue as the F & P is a longer test than the IRI.").)

### d.      May 2017 Language Evaluation

After receiving Dr. Young's evaluation of M.B., Mrs. Delaney requested permission from M.B.'s parents in April 2017 in order to refer M.B. to the CCIU for a speech and language evaluation.  (*See* S-16.)  In May 2017, Ms. Wanda Taylor, a speech and language therapist from the CCIU, evaluated M.B.  (*See* P-5; Hr'g Tr. 209:14–210:5.)  Ms. Taylor reported that M.B.'s score of 134 "falls solidly within the above average range, indicating overall language skills that are above expected limits for her age and grade."  (P-5 at p. 2.)  As such, Ms. Taylor explained that M.B. was not eligible for the CCIU's speech and language program for pull-out language therapy.  (*Id.* (explaining that students are eligible for direct services if they score below an 85 and that "students who exhibit Auditory Processing Disorders with no other concomitant language problems are ineligible for pull-out services").)

### e.      End of Year Progress

At the end of M.B.'s third grade year, in June 2017, Ms. Kennedy completed another progress report, which included M.B.'s end of year reading test results.  (S-19.)  Ms. Kennedy reported that M.B. "has shown growth in reading this year, but has trouble focusing when she is reading and writing."  (*Id.*)  Ms. Kennedy recommended that M.B. continue in the CCIU reading program in fourth grade.  (*Id.*)  Ms. Kennedy also suggested that M.B. take reading tests in hard copy, rather than on the computer, and with Mrs. Delaney in the learning resource room, as opposed to in her classroom, to reduce distractions and to improve M.B.'s focus.  (*Id.*)

According to M.B.'s mother, "third grade was a really 'good year' for [M.B.]"[18]  (P-7 at p. 4.)  According to M.B.'s classroom teacher Ms. Campbell, M.B. "struggled" and "received

---

[18]  M.B.'s mother noted that in the beginning of third grade M.B. started to work with a psychologist who had been recommended by her pediatrician.  (Hr'g Tr. at 343:7–13.)  The psychologist helped M.B. with her social struggles.

grades of mostly 70's to low 80's on tests, earning grades on the lower end of the spectrum compared to those of her classmates." (*Id.* at p. 5.)  Ms. Campbell believed those grades were "an accurate reflection of [M.B.'s] ability." (*Id.*)

### 6.  Summer 2017

During the summer between third and fourth grades, M.B. continued to work with her private tutor, and Ms. Kennedy gave M.B.'s parents suggestions for areas that the tutor should work on with M.B. over the summer.  (Hr'g Tr. at 341:6–21.)  In addition, M.B. worked with a Wilson certified tutor that her parents hired specifically for the summer.  (*Id.*)

In July 2017, both of M.B.'s parents attended M.B.'s yearly physical appointment. During this appointment M.B.'s parents asked to speak alone with M.B.'s pediatrician and explained "everything that had been going on with [M.B.] that – well, over the three years with the struggling to read and the struggling to make friends and the struggling to pay attention." (*Id.* at 344:15.)  The pediatrician explained to M.B.'s parents that their school district would do a psychoeducational evaluation on M.B.[19]  (*Id.* at 342:21–25, 343:19–345:2 (M.B.'s mother's testimony that the pediatrician recommended a psychological evaluation); P-7 at p. 3 (Dr. Rosoff's report stating that the pediatrician recommended psychoeducational testing).)  The parents received a recommendation for a private evaluator from a friend and arranged for Dr. Janet Rosoff of the Paoli Center for Psychological Services to evaluate M.B.  (*Id.* at 345:3–11; P-7.)

After meeting with M.B. and M.B.'s parents and also gathering information from Mrs. Delaney, Ms. Campbell, and M.B.'s tutor, Dr. Rosoff concluded that M.B. has a Specific

---

[19] The pediatrician stated that because it was summer, she did not know if having the school district evaluate M.B. was "the best idea" to the extent M.B.'s parents were "thinking [they] might need to make a change for [M.B.] prior to the school year starting." (*Id.* at 344:21–345:2.)

Learning Disorder with Impairment in Reading, a Specific Learning Disorder with Impairment in Written Expression, and a Specific Learning Disorder with Impairment in Mathematics. (P-7 at p. 25.) Dr. Rosoff also determined that M.B. had a "deficit in processing speed substantial enough to constitute a learning disability under the label Other Specified Neurodevelopmental Disorder." (*Id.*) Dr. Rosoff also diagnosed M.B. with Attention Deficit Hyperactivity Disorder – Predominantly Inattentive Type ("ADHD"). (*Id.*) Dr. Rosnoff observed that M.B.'s problems with attention, organization, and task monitoring are a byproduct of her learning disabilities and ADHD. (*Id.*)

Moreover, Dr. Rosoff observed that M.B. had challenges and weaknesses typically associated with dyslexia. (*Id.* at pp. 25–26.) For instance, Dr. Rosoff noted that "fine-motor development [was] an area of weakness for [M.B.] with ongoing challenges in letter formation and automaticity that are part of the dyslexic profile" and that M.B.'s "weaknesses in phonological awareness and automaticity are some of the identifying factors of dyslexia." (*Id.* at p. 25.) Dr. Rosoff also reported that "[e]valuation of [M.B.'s] current reading skills show some trends that are frequently seen in dyslexic students, such as struggling to decode and blend words." (*Id.*) For example, M.B. "skips over words in text and alters sentences she reads, significantly changing the meaning content." (*Id.*) Ultimately, Dr. Rosoff concluded that "the results of [the] evaluation were suggestive of dyslexia with broad weaknesses that raise concern that [M.B.] will have difficulty mastering more advanced material." (*Id.* at p. 26.)

In addition, Dr. Rosoff reported that "weaknesses in perceptual-motor development have a direct impact on [M.B.'s] writing skills." (*Id.*) Dr. Rosoff found that M.B.'s command of the mechanics of writing were below grade level and her overall writing was in "the Low Average range and below grade expectation." (*Id.*) As for mathematics, Dr. Rosoff determined that M.B.

16

was "functioning below age expectation." (*Id.*)

Given M.B.'s learning disabilities and challenges, Dr. Rosoff recommended that the parents consider transferring M.B. "to an independent school specializing in the education of students with learning disabilities." (*Id.*; *see also* Hr'g Tr. at 346:4–12 (M.B.'s mother's testimony that Dr. Rosoff recommended AIM Academy, Delaware Valley Friends, and Benchmark[20] as schools that specialize in helping children with learning differences).)  Dr. Rosoff also recommended that M.B. repeat third grade at a new school for several reasons, including that it would allow her time to mature given that she is young for her grade,[21] that it would give her additional time to learn coping strategies and develop self-esteem and confidence before entering middle school, and that it would give her time to solidify her "reading, math and writing skills" before moving to more advanced material.  (P-7 at p. 26  (noting that "there are significant gaps" in M.B.'s "development of reading, math and writing skills that need to be solidified before she must face having to master more advanced material").)  Further, Dr. Rosoff recommended that M.B. receive an Occupational Therapy Evaluation, that the family consider options for improving M.B.'s attention (including psychostimulant medication or non-medicinal options like behavior therapy), and that M.B. attend psychotherapy to address her emotional struggles.  (*Id.* at pp. 26–27.)

---

[20] M.B.'s mother testified that before the evaluation, M.B. was "still enrolled at Villa" and the family "had every intention of staying at Villa for fourth grade."  (Hr'g Tr. at 345:12–14.)  According to M.B.'s mother, Dr. Rosoff recommended these specialized schools over a district program because M.B. was "too far behind" and "public school wouldn't catch her up in time."  (*Id.* at 346:14–22 ("That we had missed crucial years of when someone learns to read, and we were too far behind.").)

[21] The report incorrectly stated that M.B. has "an August birthday."  (P-7 at p. 26.)  M.B. has an early June birthday.  (*See, e.g.*, Hr'g Tr. at 379:2–3; S-4.)

### 7.   Third Grade Year at the Benchmark School (2017–2018)

Following M.B.'s evaluation with Dr. Rosoff, M.B.'s parents enrolled her in the
Benchmark School to repeat the third grade. (Hr'g Tr. at 346:17–348:1.)  M.B. started at
Benchmark in September 2017.  (*Id.*)  When she first started at Benchmark, M.B. was in a mixed
third and fourth grade instruction classroom; she did a fourth grade math curriculum and a third
grade reading curriculum.  (*Id.* at 348:2–349:12.)  There were about 12 students in her classroom
and three to four teachers.  (*Id.* at 350:2–12.)

### 8.   Fourth Grade Year at the Benchmark School (2018–2019)

The following year, M.B. remained at Benchmark for the fourth grade.  For reading,
M.B. was instructed at the fourth-grade level and for math, she was instructed at the fifth-grade
level.  (P-9 at pp. 17–18.)

#### a.      *August 2018 Occupational Therapy Evaluation*

In August 2018, about a year after M.B. started at Benchmark, Ms. Maryann Brennan, a
pediatric occupational therapist and school psychologist, evaluated M.B.  (*See* P-8.)  M.B.'s
parents requested that she evaluate M.B.'s fine motor, visual motor, and motor coordination
skills to determine ongoing needs for educational programming.  (*Id.* at p. 1.)  M.B.'s visual
motor control and dexterity skills were "below average," which "can contribute to difficulty with
classroom tasks such as writing, copying and work completion."  (*Id.* at pp. 2, 4.)  Ms. Brennan
concluded that M.B. would benefit from weekly Occupational Therapy sessions "to focus on
coordination and dexterity while developing compensatory skills for auditory processing
difficulties and motor control."  (*Id.*)  After this, Ms. Brennan met with M.B. once a week for 30

minutes.  (P-9 at p. 20.)

> ### b.    *November 2018 WCASD Evaluation*

A few months later, WCASD reached out to the parents about evaluating M.B.  (Hr'g Tr. at 358:3–13.)  School psychologists Dr. Kristy Kane[22] and Libby Polchin conducted the evaluation in November 2018.  (*Id.* at 33:25–34:12; P-9 at p. 22.)  One of M.B.'s teachers, Mrs. Melinda Rahm, reported that M.B. "has grade appropriate skills in reading fluency and reading comprehension with literal comprehension questions," but has "below grade level decoding skills" and "has difficulty with critical thinking and analyzing information."  (*Id.* at p. 17.)  M.B. also was not "demonstrating grade appropriate skills" with respect to writing.  (*Id.* at p. 18.)  Mrs. Rahm also reported that M.B. "frequently (daily) becomes easily distracted" and "often (weekly) talks out or blurts out in class."  (*Id.*)  In addition, Mrs. Rahm stated that M.B. "has trouble making/keeping friends" and "can be unaware of social boundaries."  (*Id.*)  Ms. Polchin observed M.B. at Benchmark and administered several assessments.  (*See generally id.*; *see also* Hr'g Tr. at 52:16–54:1.)

Overall, the evaluators determined that M.B. "currently presents with a Specific Learning Disability in Basic Reading Skills" and therefore should receive special education services.  (*Id.* at pp. 38–40.)  The report noted that "[a]lthough [M.B.] was previously diagnosed with auditory processing disorder, evidence of that disorder was not prominent in the current assessment profile."  (*Id.*)  "Academic weaknesses were most evident in areas that would be affected by anxiety, behavioral regulation, and attention difficulties."  (*Id.*)

M.B. also was evaluated on speech/language and occupational therapy, which is reflected

---

[22] Dr. Kane is an independent contractor hired by the CCIU and assigned to the WCASD.  In that position, she evaluates students who are residents of the District.  (*Id.* at 53:19–21, 54:2–14.)

in the January 25, 2019 addendum to the WCASD report.  (*Id.* at pp. 38–39.)  M.B. did not

present with a speech or language impairment and was not eligible for speech and language

therapy.  (*Id.* at p. 38.)  In addition, the report concluded that M.B. did not need "school based

occupational therapy services."  (*Id.* at p. 39.)

As for the behavioral portion of the evaluation, the results of one behavior assessment

indicated "significant concern for Hyperactivity, Anxiety, Depression and Withdrawal" and

another assessment "indicate[d] concern for self-monitoring, emotional control, and flexibility."

(*Id.*)  The evaluators reported that M.B's "executive functioning deficits associated with ADHD

appear to be impacting [her] ability to build relationships with peers."  (*Id.*)

### B.    Procedural History

Plaintiffs filed a due process complaint against the CCIU on October 25, 2018, arguing

that the CCIU breached its child find obligation and seeking compensatory education and

reimbursement for tuition, the costs of evaluations, and occupational therapy.  (S-30.)  On March

19, 2019, the hearing officer found that the due process complaint was time-barred and that, in

the alternative, the CCIU did not breach its child find obligation with respect to M.B.  (*See

generally* HO Decision.)  The hearing officer denied Plaintiffs' claims for compensatory

education and tuition reimbursement.  (*See id.*)  On June 17, 2019, Plaintiffs filed a complaint

appealing the hearing officer's decision.  (Doc. No. 1.)

On December 9, 2019, Plaintiffs filed a Motion for Judgment on the Administrative

Record, arguing that the due process complaint was timely, that the CCIU violated its child find

obligations with respect to M.B., and that the equities support tuition reimbursement and

compensatory education.[23]  (Doc. No. 10.)  The CCIU opposes the motion, arguing that the

---

[23] In the factual background section of their opening brief, Plaintiffs list statistics concerning the
outcomes of the hearing officer's decisions, implying that the hearing officer was biased.  (*See* Doc. No.

hearing officer correctly determined that the due process complaint was untimely and that the

CCIU did not breach its child find obligation, and that even if the CCIU did breach its child find

duty, Plaintiffs are not entitled compensatory education or tuition reimbursement.  (Doc. No. 29.)

The Court heard argument on the motion on February 9, 2022.

## II.

### A.   *Legal Standards*

#### 1.  **Statutory Framework**

The IDEA offers federal funds to states to assist in educating children with special needs.

*Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017).  In

exchange, the State agrees to provide a Free Appropriate Public Education ("FAPE") to all

eligible children.  *Id.*  A FAPE includes "special education" and "related services."  *Id.*; *see also*

20 U.S.C. § 1401(9).  "Special education" is "specially designed instruction . . . to meet the

unique needs of a child with a disability," and "related services" are the services "required to

assist a child . . . to benefit from" their special education.  20 U.S.C. § 1412(a)(1).

Parentally placed private school children, however, are not entitled to a FAPE.  *See* 34

C.F.R. § 300.137(a) ("No parentally-placed private school child with a disability has an

individual right to receive some or all of the special education and related services that the child

would receive if enrolled in public school.").  Thus, a different statutory framework exists for

children with special needs whose parents enroll them in private school.  *See, e.g.*, C.*F. ex rel*

---

10 at p. 21 ("As of this writing, Mr. Gerl has rendered 19 decisions as an administrative hearing officer
for ODR.  The parent or parents were unrepresented in four of them and represented by counsel in the
other 15.  Pro se parents prevailed in one case before Mr. Gerl.  He has found for counseled parents on at
least one material issue in seven cases.  Put differently, counseled parents have prevailed in
approximately 47% of such cases decided by Mr. Gerl, which is below the rate for ODR generally.").)
However, Plaintiffs do not *argue* that the hearing officer was biased nor do they cite any authority or
precedent on claims of bias.  Therefore, we do not address any claims of bias in our analysis below.

*Flick v. Del. Cty. Intermediate Unit*, Civil Action No. 17-CV-5999, 2017 WL 4467498, at *3 n.5 (E.D. Pa. Oct. 6, 2017); *Shane T. ex rel. Cathy K. v. Carbondale Area Sch. Dist.*, Civil Action No. 3:16-0964, 2017 WL 4314555, at *11 (M.D. Pa. Sept. 28, 2017). "If a parent chooses to forgo a FAPE and enrolls their child in a private school," *see C.F.*, 2017 WL 4467498, at *3 n.5, then the child will receive "related services, commonly known as equitable participation," which are provided through a proportionate share of funds that states are required to allocate for parentally-placed private school children, *see Shane T.*, 2017 WL 4314555, at *11 ("States must allocate a proportionate share of funds for these parentally-placed private school children to provide them with related services, commonly known as equitable participation."); *see also* 20 U.S.C. § 1412(a)(10)(A)(i). The local educational agency ("LEA") makes the final decisions about the types of equitable services that will be provided to parentally placed private school children.[24]  34 C.F.R. § 300.137(b)(2).

Under the IDEA, LEAs have a "child find" obligation—i.e., they must identify and evaluate all students who are reasonably suspected of having a disability, irrespective of whether they are enrolled in public or private school. *See id.* § 300.11(c)(1) (explaining that child find must include "children who are suspected of being a child with a disability . . . and in need of special education, even though they are advancing from grade to grade"); *id.* § 300.11(a)(1) (providing that states must have policies and procedures in place to ensure that "[a]ll children with disabilities residing in the State, including . . . children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located and evaluated . . ."); 20 U.S.C. § 1412(a)(3)(A)

---

[24] Here, the CCIU does not provide direct services to individual students. (*See* Hr'g Tr. at 213:17–20, 250:4.)

(same); *see also Shane T.*, 2017 WL 4314555, at *11 ("The child-find obligation . . . does apply to both public and parentally-placed private school children.").  With respect to parentally placed private school children, however, "the child find process shall be designed to ensure equitable participation," rather than a FAPE.  *See* 20 U.S.C. § 1412(a)(10)(A)(ii); *see also* 34 C.F.R. § 300.131(b)(1) ("The child find process must be designed to ensure the equitable participation of parentally-placed private school children."); *Shane T.*, 2017 WL 4314555, at *11.  In Pennsylvania, "intermediate units are responsible for child find activities necessary to provide equitable services . . . regarding children with disabilities enrolled by their parents in private schools." 22 Pa. Code § 14.121(d).  And LEAs are required to consult with private school representatives and parent representatives about the child find process.  *See* 34 C.F.R. § 300.134(a) ("To ensure timely and meaningful consultation, an LEA . . . must consult with private school representatives and representatives of parentally-placed private school children with disabilities during the design and development of special education and related services regarding . . . the child find process, including (1) how parentally-placed private school children suspected of having a disability can participate equitably; and (2) how parents, teachers, and private school officials will be informed of the process.").

If the parents of a private school student believe that the LEA violated its child find obligation, they may request an impartial due process hearing.  *See* 20 U.S.C. § 1415(f)(1)(A); *see also* 34 C.F.R. § 300.140 (stating that due process is not applicable for parentally placed private school children, "except for child find").  The parents must do so within two years of the date they "knew or should have known about the alleged action that forms the basis of the complaint."  20 U.S.C § 1415(f)(3)(C).  In Pennsylvania, hearings are conducted by "hearing officers," outside contractors hired by the Pennsylvania Secretary of Education.  *See* 22 Pa. Code

§ 14.162(p)(1).  After exhausting their administrative remedies, parents dissatisfied with the hearing officer's decision may seek judicial review in federal or state court.  20 U.S.C. § 1415(i)(2)(A); *see also Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014).  On appeal, the burden of proof falls on the party challenging the hearing officer's decision.  *See Schaffer v. Weast*, 546 U.S. 49, 56–58 (2005).

### 2.  Standard of Review

In IDEA cases, district courts are to conduct a "modified *de novo* review" of a hearing officer's decision.  *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 269–70 (3d Cir. 2003).  The court exercises plenary review over the hearing officer's legal conclusions, *Colonial Sch. Dist. v. G.K. ex rel. A.K.*, CIVIL ACTION NO. 17-3377, 2018 WL 2010915, at *2 (E.D. Pa. Apr. 30, 2018), *aff'd*, 764 F. App'x 192 (3d Cir. 2019), but must give "due weight" to the hearing officer's factual findings, *S.H.*, 336 F.3d at 269.  The hearing officer's factual findings are considered prima facie correct, and the court may only depart from those findings if it explains why and supports its explanation with citations to the administrative record.  *Id.* at 270; *see also D.S. v. Bayonne Bd. of Ed.*, 602 F.3d 553, 564 (3d Cir. 2010) (explaining that if a district court does not adhere to the hearing officer's factual findings, "it is obliged to explain why").  This "due weight" standard restricts courts from "imposing their own view of preferable educational methods on the states."  *D.S.*, 602 F.3d at 564; *see also S.H.*, 336 F.3d at 270 (noting that a court may not "substitute its own notions of sound educational policy for those of local school authorities." (quoting *MM v. Sch. Dist. of Greenville Cty.*, 303 F. 3d 523, 530–31 (4th Cir. 2002))).

Where, as here, a hearing officer "hear[s] live testimony and determine[s] that certain witnesses [are] more credible than others," a court must give that "determination . . . special

weight." *D.S.*, 602 F.3d at 564.  In short, a court "must accept [the hearing officer's] credibility

determinations unless the non-testimonial, extrinsic evidence in the record would *justify* a

contrary conclusion." *Id.*; *see also Montgomery Cty. Intermediate Unit No. 23 v. A.F. ex rel.*

*D.F.*, 506 F. Supp. 3d 293, 303 (E.D. Pa. 2020).

> **B.**    **Analysis**

Plaintiffs seek review of the hearing officer's decision.  In their motion, Plaintiffs argue

that (1) the child find claim was not time-barred; (2) the CCIU violated its child find obligations;

and (3) Plaintiffs are entitled to tuition reimbursement and compensatory education.  (Doc. No.

10.)  Because we affirm the hearing officer's decision that the complaint was untimely, we need

not reach the remaining issues.

> **1.    The Hearing Officer Correctly Found that Plaintiffs' Due Process**
> **Complaint Was Time Barred**

As noted above, the IDEA has a two-year statute of limitations:  a parent must request a

due process hearing within two years of "the date the parent . . . knew or should have known

about the alleged action that forms the basis of the complaint."  20 U.S.C. § 1415(f)(3)(C); 34

C.F.R. § 300.511(e).  The "knew or should have known" inquiry "requires a highly factual

determination." *J.L ex rel. J.L. v. Ambridge Area Sch. Dist.*, 622 F. Supp. 2d 257, 266 (W.D. Pa.

2008).  The Third Circuit has held that this statute of limitations also applies to claims brought

under § 504 of the Rehabilitation Act that are premised on IDEA obligations, such as child find

claims. *See D.K. v. Abington Sch. Dist.*, 696 F.3d 223, 244 (3d Cir. 2012); *P.P. ex rel.*

*Michael P. v. W. Chester Sch. Dist.*, 585 F.3d 727, 735–377 (3d Cir. 2009).  There are two

statutory exceptions to this limitations period.  20 U.S.C. § 1415(f)(3)(D)(i)–(ii).  Specifically,

the statute of limitations

> shall not apply . . . if the parent was prevented from requesting the hearing
> due to—(i) specific misrepresentations by the local educational agency that

it had resolved the problem forming the basis of the complaint; or (ii) the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent.

*Id.*

To determine whether Plaintiffs' claims are time-barred, the Court must first assess when M.B.'s parents "knew or should have known" that the CCIU violated its child find obligations. Because Plaintiffs filed the due process complaint on October 25, 2018, if they "knew or should have known" of the violation before October 25, 2016, then their claim would be time-barred, unless one of the equitable tolling exceptions applied.

In his decision, the hearing officer determined that Plaintiffs "knew or should have known" of the violation by August 2015 and that their complaint was therefore time-barred. (HO Decision at p. 18 ¶ 4 & pp. 20–24.)  In reaching this conclusion, the hearing officer made the following findings of fact:

- In May of 2015, during M.B.'s first grade year, Ms. Kennedy suggested that M.B. receive a psychoeducational evaluation.  (*Id.* p. 6 ¶ 14.)

- Ms. Kennedy made the recommendation to the teacher and principal at Villa Maria and told the parents about the recommendation.  (*Id.*)

- M.B.'s parents told Ms. Kennedy that they intended to have M.B. tested by one of M.B.'s mother's friends in New York.  (*Id.*)

Plaintiffs contend that the evidence in the record belies the hearing officer's factual findings and that therefore we need not give those findings due weight.  (Doc. No. 10 at p. 36.) Plaintiffs argue that the hearing officer mischaracterized Ms. Kennedy's testimony and wrongly credited Ms. Kennedy's testimony over M.B.'s mother's testimony; they assert that an email exchange between Ms. Kennedy and M.B.'s mother in February 2017 supports M.B.'s mother's testimony and undermines Ms. Kennedy's.[25]  (*Id.*)  The CCIU disagrees, arguing that the record

---

[25] According to Plaintiffs, they first learned that M.B. was a student with disabilities in February 2017,

supports the hearing officer's determination.

During the due process hearing, Ms. Kennedy testified:

Q: Now, did you at any point during your work with [M.B.] during her first grade year suggest to any of your colleagues at the CCIU, to any of her teachers at Villa Maria Academy, or to [M.B.'s] Parents that [M.B] should receive psycho-educational testing?

A: Yes.

Q: To whom did you make that suggestion?

A: To – I'm sure that I made that recommendation to her teacher at Villa, and probably the principal at Villa.

Q: Why did you make that recommendation?

A: Because I thought that she had a learning difference.

Q: And that was in the first grade?

A: Yes.

Q: To your knowledge was that testing ever done?

A: You mean by the CCIU or –

Q: By anybody.

A: There's nothing documented about this, but I was pretty sure that the Parents told me they were having her tested by one of . . . [M.B.'s mother's] friends in New York or something.  But somebody was going to test her, but I never saw any results of that.

Q: Do you remember when that conversation was?

A: I think it would have been at the end of first grade in a conference, which would have been in May.  End of May, first part of June.

(Hr'g Tr. at 123:12–124:19.)  Although Ms. Kennedy claims she spoke with M.B.'s parents in

May 2015, M.B.'s mother testified that the conversation occurred two years later, in February

2017, when M.B. was in third grade at Villa Maria.  M.B.'s mother testified:

---

after receiving Dr. Young's report diagnosing M.B. with an auditory processing disorder.  (*Id.*)

Q: Now, did you ever have a talk with Ms. Kennedy about a friend in New York who does reading or teaches reading?

A: I did, yes.

Q: When was that?

A: I believe it was third grade . . . First time through third grade while we were at Villa . . . It was while we were having the conversation about whether [M.B.] should do a third summer at Benchmark's reading program.

(*Id.* at 326:25–327:13.)

The Court does not agree with the hearing officer to the extent he found that Ms. Kennedy testified that she "told the parents" she recommended M.B. be evaluated in May 2015 (*see* HO Decision at ¶ 4); nowhere in her testimony does Ms. Kennedy explicitly say that she suggested to the parents that M.B. should be evaluated.  Nevertheless, the parties agree that a conversation between Ms. Kennedy and M.B.'s parents regarding M.B.'s progress led to a comment that M.B.'s mother would reach out to her friend, a reading specialist in New York for testing; they just disagree on exactly when it happened.[26]  Focusing on the issue of timing, we find that the hearing officer could reasonably infer—from Ms. Kennedy's testimony and the other evidence in the record—that Ms. Kennedy had a conversation with M.B.'s parents about M.B. being evaluated and that this conversation occurred in 2015.

First, Ms. Kennedy's memory that she and M.B.'s parents discussed Ms. Kennedy's belief that M.B. might have a learning difference and need an evaluation at the end of M.B.'s first grade year is indirectly supported by Ms. Kennedy's handwritten notes, which show that she did have a telephone conference with M.B.'s parents on May 29, 2015.  (*See* P-1 at p. 7.)  The

---

[26] As mentioned, M.B.'s mother does not dispute she had a conversation with Ms. Kennedy regarding M.B.'s progress, but instead, claims it occurred in February 2017 when M.B.'s mother asked for M.B.'s reading level on a recent assessment in order to pass that information along to M.B.'s private tutor and M.B.'s mother's best friend, a reading specialist in New York.

notes state that during this call, Ms. Kennedy and M.B.'s parents discussed M.B. attending the intensive summer reading program at the Benchmark School, the IST process in place for M.B. for second grade, and Ms. Kennedy's progress report and Sandford Diagnostic Reading Test results which would be sent home.  (*Id.*)  In addition to these notes, the Court finds it significant that at no time have Plaintiffs offered any evidence to show that the May 2015 conversation between the parents and Ms. Kennedy did not occur.

Second, the Court also agrees with the hearing officer's finding that Ms. Kennedy's testimony is more credible than M.B.'s mother's because M.B.'s mother cherry-picked which memories she recounted with specificity and which she could not recollect.  (*See* HO Decision at pp. 23–24 ("To the extent that the testimony of witnesses favorable to the parents is contradicted by the testimony of the school district witnesses concerning this issue, the testimony of district witnesses is more credible and persuasive than the testimony of the parents' witnesses.  In particular, the testimony of the student's mother as to the issue is suspect because of her selective memory—she testified that she could not remember anything that the student's [Benchmark summer reading] teacher had said to the mother at the end of the intensive summer reading programs that the student attended at the private school for students with disabilities.  This testimony stands in stark contrast to the excellent memory that the student's mother had with regard to almost every other detail concerning the student's entire educational program.").)

M.B.'s mother's inability to recollect nearly *any* details about the Benchmark summer program is dubious and calls into question her credibility.  M.B.'s mother testified that the Benchmark summer program was quite the financial commitment and that it was also a commitment in terms of the nightly reading it required throughout the summer for M.B. and her parents.  (Hr'g Tr. at 369:7–19.)  Yet M.B.'s mother did not recall how M.B. scored on the

reading assessment M.B. took before being placed into the summer program; she did not recall whether she received a daily or weekly communication from the reading teacher working with M.B.; she could not recall how long M.B. was supposed to read at night during the program; she did not recall when the parent–teacher conference occurred during the summer or what the teacher told her during the conference; and she could not even remember who M.B.'s teacher was.  (*Id.* at 367:2–10, 368:12–17, 369:20–370:6, 370:16–25, 371:13–20; *see also id.* at 374:13–20, 375:3–12.)[27]

And, because the hearing officer heard live testimony, the Court may not disturb his credibility determination unless there is extrinsic evidence in the record justifying a contrary conclusion.[28]  *See D.S.*, 602 F.3d at 564; *Montgomery Cnty. Intermediate Unit No. 23,* 506 F. Supp. 3d at 303.  Here, there is not.

Plaintiffs argue that a February 2017 email exchange between Ms. Kennedy and M.B.'s mother corroborates the mother's testimony that they did not discuss having M.B. evaluated by her reading specialist friend in New York until February 2017.  (Doc. No. 10 at p. 36 (citing P-4).)  But this email alone does not justify departing from the hearing officer's finding that Plaintiffs "knew or should have known" of the violation in August 2015.  (*See* P-4.)  Rather, the

---

[27] M.B.'s mother's response was the same for *both* summers that M.B. attended the Benchmark summer program.  (*See id.*)  The Court also notes that presumably when M.B. applied to be enrolled in Benchmark for the 2017–2018 school year, the application would have included the fact that M.B. attended the summer program there for two summers and her progress during those summers.

[28] The Court rejects Plaintiffs' argument that the hearing officer chose to credit Ms. Kennedy's "uncertain" memory over M.B.'s mother's "certain" memory.  (*See* Doc. No. 10 at p. 36.)  Both individuals' memories appear equally certain.  (*Compare* Hr'g Tr. at 124:7–19 (Ms. Kennedy's testimony that she "was pretty sure that the Parents told [her] they were having her tested by one of [M.B.'s mother's] friends in New York" and that she "think[s] it would have been at the end of the first grade in a conference"), *with id.* at 330:1–6 (M.B.'s mother's testimony that "then we had third grade.  I guess I would interject in there the conversation with Mrs. Kennedy about the reading specialist in New York came in probably May").)

email shows that in February 2017, M.B.'s mother reached out to Ms. Kennedy to ask for her input on whether M.B. should do a third summer at Benchmark or instead work with a private tutor over the summer.  (*Id.* at p. 3.)  Ms. Kennedy responded that she thought working with a tutor over the summer would be a good option for M.B.  After this exchange, M.B.'s mother asked, "Would you be able to tell me what level [M.B.] tested at in the Fountas and Pinnell Assessment?  Both her tutor and my best friend (a reading specialist in NY) asked."  (*Id.* at pp. 1–2.)  Significantly, nothing in this email shows that Ms. Kennedy and M.B.'s mother talked about evaluating M.B. *for the first time* in 2017.  Rather, this exchange shows that M.B.'s mother was following up on the new assessment administered by Ms. Kennedy in third grade, the F&P.[29]  M.B.'s mother wanted to know M.B.'s level after taking the F&P to pass that information along to M.B.'s private tutor and her reading specialist friend in New York, from whom she was seeking advice regarding M.B.'s needs.  Although Plaintiffs would like the Court to find this email exchange only supports M.B.'s mother's testimony—that she first mentioned her reading specialist friend to Ms. Kennedy in February 2017—it is just as likely that it supports Ms. Kennedy's testimony that she learned about M.B.'s mother's reading specialist friend prior to February 2017 and here, M.B.'s mother is referencing her friend again (e.g., M.B.'s mother first mentioned the reading specialist friend in May 2015 when discussing evaluating M.B. and then M.B.'s mother reminded Ms. Kennedy that she had this friend in February 2017 when this email was sent).  Therefore, the Court cannot find that this email is sufficient to reverse the hearing officer's finding.

---

[29] As noted above, Ms. Kennedy testified that she did not begin administering the F&P until the fall of 2016.  (Hr'g Tr. at 110:4–16.)  Based on the record, January 2017 appears to be the first time M.B. took the F&P.  (*See* S-12 (January 30, 2017 report stating M.B.'s mid-year F&P scores); P-4 (Ms. Kennedy stating in February 2017 email exchange that M.B. "tested at Level L which is middle of second grade"); P-6 at p.1 (comparing mid-year and end of year raw scores on the F&P in 2017).)

The Court also finds that the hearing officer's determination that the parents "knew or should have known" date was in August 2015 is buttressed by the fact that on May 11, 2015, M.B.'s parents attended a parent–teacher conference at Villa Maria in order to discuss the IST process being put in place for M.B.[30]  With the IST, M.B. would receive additional support throughout second grade.  M.B. would continue to receive instruction in the Wilson Reading System twice a week with one other student, she would continue to work with Ms. Kennedy once a week, and she would attend the Benchmark reading camp over the summer.

Although the Court will affirm the hearing officer's ultimate conclusion—that the "knew or should have known" date was in August 2015—as there is no extrinsic evidence in the record that would justify reversing his decision, the Court notes that it does not blindly agree with the hearing officer, nor do we adopt all of the hearing officer's factual findings.  In addition to the misinterpretation of Ms. Kennedy's testimony discussed above, to the extent that the hearing officer's factual findings can be construed as concluding that the Benchmark *summer reading camp* only accepted children with disabilities, and to the extent that the hearing officer relied on such a finding in determining the "knew or should have known" date, the Court disagrees and concludes that that finding is not entitled to "due weight."  (*See, e.g.*, HO Decision at p. 6 ¶ 15 ("During the summer after first grade, the parents enrolled the student in an intensive summer reading program/camp at a private school that only accepts students with disabilities.").) Although record evidence supports a conclusion that the Benchmark School only accepts students with disabilities during the school year, there is insufficient evidence in the record to find that the same is true for Benchmark's *summer reading program*.[31]

---

[30]  The Court notes that following this conference, the parents had a telephone conference with Ms. Kennedy on May 29, 2015.

[31] Moreover, the Court is not persuaded by the CCIU's argument that the fact that the parents read with

Again, although the administrative record is limited and makes this an extremely close call, the Court finds that Plaintiffs have failed to meet their burden of proof in challenging the hearing officer's decision.  The evidence supports that Ms. Kennedy told M.B.'s teachers and principal at Villa Maria that Ms. Kennedy believed M.B. had a learning difference and needed to be evaluated at the end of first grade.  Additionally, there is sufficient evidence to reasonably infer that Ms. Kennedy discussed her belief concerning M.B. with M.B.'s parents during the same timeframe (May 2015).  Also, the evidence shows that in May 2015, Villa Maria met with M.B.'s parents to form an IST team for M.B. and M.B.'s parents agreed to send M.B. to the Benchmark School's intensive summer reading program.  Further, the hearing officer's finding that Ms. Kennedy testified more credibly than M.B.'s mother, must be given due weight.  Thus, viewing all of this together, is sufficient for the Court to find the record supports the hearing officer's finding that "the knew or should have known" date is no later than August 2015.

\*       \*       \*

Because Plaintiffs "knew or should have known" that the CCIU breached its child find duties in August 2015—more than two years before the October 25, 2018 date that the due process complaint was filed—the Court must now consider whether either of the statutory exceptions applies, such that Plaintiffs' claims were equitably tolled.

---

M.B. at night meant that they should have suspected a disability.  (*See* Feb. 9, 2022 Hr'g Tr. at 42:3–7 ("[S]he's reading at home – so the parent is aware of how the child is reading is my point.  The parent is fully aware of how the child reads at that same time.").)  And to the extent the hearing officer relied on this fact in reaching his conclusion, we do not.  (*See* HO Decision at p. 21 (noting that "the parents read with the student in the evening" as part of the "extensive home reading component" of the Benchmark summer program).)  Parents are not expected to be experts in education, and M.B. had only just finished first grade.

Likewise, the fact that M.B. received Act 89 reading services from the CCIU does not compel a conclusion that the parents knew or should have known M.B. had a suspected disability at that time and to the extent that the hearing officer relied on that fact, we do not follow suit here either.  (*See* HO Decision at pp. 20–21; *see also* Feb. 9, 2022 Hr'g Tr. at 42:14–23, 61:9–13.)

   a.   *The CCIU Did Not Intentionally Misrepresent M.B.'s Needs and Progress*

For the specific misrepresentation exception to apply, Plaintiffs must demonstrate that the CCIU knowingly or intentionally misrepresented M.B.'s needs or progress *and* that the misrepresentation caused their failure to file their due process complaint on time.  *D.K.*, 696 F.3d at 245–46 ("[W]e conclude that a rule demanding at least a school's *knowledge* that its representation of a student's progress or disability are untrue or inconsistent with the school's own assessments best comports with the language and intent of the provisions.  Therefore, we hold that in order to be excused from the statute of limitations [based on the specific misrepresentation exception] . . . plaintiffs must show that the school intentionally or knowingly deceived them regarding their child's progress."); *id.* at 246 ("Establishing evidence of specific misrepresentation or withholding of information is insufficient to invoke the exceptions; a plaintiff must also show that the misrepresentations or withholding *caused* her failure to request a hearing or file a complaint on time.").  If we did not require such a showing of knowledge or intent, "[m]ere optimism in reports of a student's progress would toll the statute of limitations" and allegations "that Child Find obligations were not met would nearly always suffice to extend the timeframe beyond that dictated by the statute of limitations."  *Id.* at 245–46.

The hearing officer determined that the specific misrepresentation exception did not apply, reasoning that "the parents refer[red] to the intermediate unit's alleged lack of candor in reporting the student's progress in the Act 89 reading program as the basis for the applicability of the exception[]" but there was no factual basis for that statement as "the record evidence indicate[d] . . . that the student was making reasonable progress and was on grade level with regard to reading."  (HO Decision at p. 22.)

In their briefing before this Court, Plaintiffs admits that "the data about M.B. [was]

34

arguably discrepant on whether M.B. was making appropriate progress" and instead argue that their claims are equitably tolled because Ms. Kennedy and the CCIU knowingly misrepresented M.B.'s need for an *evaluation*.  (*See* Doc. No. 10 at pp. 37–38.)  In other words, Plaintiffs assert that because Ms. Kennedy believed M.B. had a learning difference in the first grade and did not communicate that information to the parents, the CCIU made a knowing misrepresentation.  (*Id.*; *see also* Doc. No. 12 at p. 3 ("The CCIU misrepresented its knowledge of M.B.'s need for [an] evaluation from Parents."); *id.* ("But [the CCIU] communicated to Parents *only* that it believed M.B. was making adequate progress—not its own, concurrent assessment that she required evaluation for equitable participation eligibility.").)

As discussed above, the Court finds that the hearing officer could reasonably infer—from Ms. Kennedy's testimony and the other evidence in the record—that Ms. Kennedy had a conversation with M.B.'s parents about M.B. being evaluated and that this conversation occurred in 2015.  Accordingly, the Court holds that Plaintiffs have failed to meet their burden of showing that Ms. Kennedy intentionally or knowingly misrepresented the need for M.B. to be evaluated— to the contrary, she informed the parents of that need.  And the case on which Plaintiffs rely, *Evan H. ex rel. Kosta H. v. Unionville-Chadds Ford School District*, Civil Action No. 07-4990, 2008 WL 4791634 (E.D. Pa. Nov. 4, 2008), does not alter our analysis.  In *Evan H.*, the court held that to show a specific misrepresentation, the plaintiffs must establish "that the District subjectively determined that the student was eligible for services under IDEA but intentionally misrepresented this fact to the parents."  *Id.* at *6.  But that is not what we have here; rather, Ms. Kennedy subjectively thought that M.B. might have a learning difference and communicated to the parents, as well as Villa Maria, that they might want to have M.B. evaluated in May 2015. Therefore, the specific misrepresentation exception does not apply to toll the statute of

limitations.

> **b.** ***The CCIU Did Not Withhold Statutorily Mandated Information***

For the withholding exception to apply, Plaintiffs must show that the CCIU withheld information that it was required to provide under the IDEA and that this caused their failure to timely file their due process complaint. *See* § 1415(f)(3)(D)(ii); *D.K.*, 696 F.3d at 246 ("[O]nly the failure to supply statutorily mandated disclosures can toll the statute of limitations. In other words, plaintiffs can satisfy this exception only by showing that the school failed to provide them with a written notice, explanation, or form specifically required by the IDEA statutes and regulations."); *id.* at 246 (explaining that plaintiffs must establish causation for the withholding exception to apply).

The hearing officer noted that Plaintiffs "refer[red] to the intermediate unit's alleged lack of candor in reporting [M.B.'s] progress in the Act 89 reading program" as the basis for applying the withholding exception as well. (HO Decision at 23.) The hearing officer determined that the exception did not apply and found that "because Act 89 is not an IDEA requirement but a separate program required by state statute," the CCIU was not required to report M.B.'s progress under Act 89. (*Id.*)

In their motion for judgment on the administrative record, Plaintiffs argue that the CCIU withheld information that it was statutorily mandated to provide to the parents, but critically, they fail to cite to any specific information that the CCIU was statutorily obligated to provide and did not. (*See* Doc. No. 10 at pp. 37–38.) Rather, Plaintiffs appear to rely on the same argument as above—namely, that the withholding exception applies because Ms. Kennedy and the CCIU failed to inform Plaintiffs that M.B. needed to be evaluated. (*See id.* at p. 38 ("The HO Decision also attempts to gloss over the withholding of information by the CCIU. It takes the position that it was perfectly acceptable for the CCIU to (1) know that M.B. was entitled to an

evaluation under the IDEA for equitable participation services and (2) withhold that information by characterizing the transmission of that critical information to Parents as an 'IDEA duty' that was not owed because M.B. was 'enrolled in a private school.'").)  But because the Court finds that the hearing officer could reasonably infer—from Ms. Kennedy's testimony and the other evidence in the record—that Ms. Kennedy had a conversation with M.B.'s parents about M.B. being evaluated and that this conversation occurred in 2015, Plaintiffs' argument that the withholding exception applies because the CCIU did not notify the parents of the need for an evaluation necessarily fails.

In their reply and at oral argument, Plaintiffs argue—for the *first time*—that the statute of limitations is tolled because the CCIU failed to provide the permission to evaluate form or procedural safeguards notice.  (Doc. No. 12 at pp. 5–6 ("Both of these were documents that the CCIU was required to provide to Parents given its belief that M.B. required evaluation.").)  However, the Court does not consider this argument, as it was raised for the first time in a reply brief.  *See, e.g.*, *United States v. Heilman*, 377 F. App'x 157, 198 ("A party's argument is waived if it is raised for the first time in a reply brief." (citing *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 192 (3d Cir. 2005)); *Hayes v. Silvers, Langsam & Weitzman, P.C.*, 441 F. Supp. 3d 62, 66 n.4 (E.D. Pa. 2020) ("[T]he Court declines to consider arguments raised for the first time in a Reply brief and therefore deems Defendant's argument as to whether Korenberg's comment was 'because of' sex waived."); *McCowan v. City of Philadelphi*a, Civil Action No. 2:19-cv-03326-KSM, 2020 WL 6485097, at *3 n.5 (E.D. Pa. Nov. 4, 2020) ("The court does not consider Defendants' relevancy argument, which was raised for the first time at oral argument and in an untimely reply brief."); *Doherty v. Allstate Indemnity Co.*, Civil Action No. 15-05165, 2017 WL 1283942, at *23 (E.D. Pa. Apr. 6, 2017) ("[B]ecause this argument was asserted for the first time

in Doherty's reply and at oral argument, it is waived.").

And, even if the Court were to consider Plaintiffs' argument, the argument would likely fail. "Procedural safeguard notices must be provided only when: (1) the student is referred for, or the parents request, an evaluation; (2) the parents file a complaint; or (3) the parents specifically request the forms." *D.K.*, 696 F.3d at 247 (citing § 1415(d); 22 Pa. Code § 14.123(c)). With respect to the permission to evaluate form, "[w]hile [a] school 'must provide notice . . . that describes any evaluation procedures the agency proposes to conduct,' the regulations do not demand that the school preemptively advise parents of their right to have their child evaluated." *Id.* (quoting 34 C.F.R. § 300.304(a)). Here, the parents did not request an evaluation, nor did they file a complaint or specifically request the procedural safeguard forms. In addition, the CCIU did not refer M.B. for an evaluation at this time; rather, Ms. Kennedy notified the parents that M.B. should be evaluated, and in turn, M.B.'s mother informed her that M.B. would be tested by someone else. Therefore, the CCIU's duty to provide the procedural safeguards notice was not triggered. For these same reasons, because the CCIU did not propose that it evaluate M.B. itself, it was not required to provide the parents with the permission to evaluate form.

Accordingly, the withholding exception does not toll the statute of limitations either.

\*      \*      \*

Because the Court finds that Plaintiffs' due process complaint was untimely, which in and of itself presents a basis for affirming the hearing officer's decision and dismissing this action, and because the question of whether the CCIU met its child find obligation presents a novel question of law (*see* Feb. 9, 2022 Hr'g Tr. at 26:23–27:1, 27:12–15, 50:20–22, 52:12–13 (counsel for both parties agreeing that this is a matter of first impression)), the Court does not

address the remaining issues.

## III.

The Court affirms the hearing officer's decision and denies Plaintiffs' Motion for Judgment on the Administrative Record.  (Doc. No. 10.)  An appropriate Order follows.